JUAN MACIAS, Plaintiff-Appellant, v. CINCINNATI FORTE, a/k/a John Doe, Indiv. and d/b/a Cincinnati Forte, *et al.*, Defendants-Appellees.

First District (5th Division)   No. 1—95—0677

Opinion filed February 2, 1996.

948

Beermann, Swerdlove, Woloshin, Barezky, Becker, Genin & London, and Goldstein, Fishman, Bender & Romanoff, both of Chicago (Alvin R. Becker, Howard A. London, Robert M. Cohen, and Lauren Evans DeJong, of counsel), for appellant.

Swanson, Martin & Bell, of Chicago (J. Lawrence Helms and Sheryl A. Pethers, of counsel), for appellees.

PRESIDING JUSTICE McNULTY delivered the opinion of the court:

Plaintiff Juan Macias brought suit against defendants Cincinnati Forte and Cincinnati Incorporated alleging product liability and negligence resulting from injuries he sustained while operating a slitter machine that was designed, manufactured and distributed by defendants. The jury returned a verdict in favor of defendants, and plaintiff appeals from the judgment entered in favor of defendant Cincinnati Incorporated. Plaintiff's sole issue on appeal is that the trial court erred in denying his motion for a new trial after it was discovered that the jury foreperson conducted independent research and presented the results of this research to the other jurors during deliberations. We affirm.

During the first day of jury deliberations on November 16, 1994, the jury sent a note to the court requesting a transcript of plaintiff's testimony. Because the request was made at 6 p.m., the trial court sent the jurors home and ordered that they return the following morning at 9:30 a.m. to continue deliberations. The jury reconvened on the morning of November 17, 1994. A transcript of plaintiff's testimony was delivered to the jury room. After deliberating for approximately 1$^1$/$_2$ hours, the jury returned a unanimous verdict for defendants.

Following the jury's discharge, plaintiff discovered that the jury foreperson, Charles Berra, had independently researched the issues of product liability and negligence and presented his research and analysis to the other jurors on the morning of November 17, 1994. In order to discover more information regarding Berra's research and what information he had presented to the other jurors, plaintiff deposed Berra on December 7, 1994.

Berra testified that on the afternoon of November 7, 1994, the

first day of trial, he went to the library and researched the definitions of certain legal terms in Black's Law Dictionary. The terms researched included "negligence," "reasonable," "reasonable conduct," "strict liability," "defective condition" and "product liability." He also researched the elements and defenses of negligence. Berra kept his research with him throughout trial and during deliberations in the form of notes. These notes were copied "pretty much" verbatim from Black's Law Dictionary.

After the jurors went home for the night of November 16, 1994, Berra further analyzed the case, relying on the legal definitions and notes he had taken on November 7, 1994. He kept this legal analysis in the form of six pages of notes.

The jurors' vote was evenly split when the jurors left for the night of November 16, 1994; six jurors voting in favor of plaintiff, and six voting in favor of defendants. The first vote on the morning of November 17, 1994, indicated that the jurors were still split. Berra told the jurors that he had changed his mind from the night before as a result of his legal analysis and proceeded to read that legal analysis to the other jurors. Berra also read portions of the notes he had taken on November 7, 1994, which defined certain legal terms. He remembers reading to the jury his notes on "reasonable," "reasonable conduct" or "reasonable care," and "defective condition." Berra stated that he did not find the definitions he had copied from Black's Law Dictionary to be inconsistent with the instructions given by the trial court.

Berra testified that the theory of reasonableness was the most confusing to the jury and that his legal research helped him to better understand reasonableness and to better interpret the facts of the case. No other member of the jury expressed to Berra that the definitions Berra read provided him or her with further understanding or influenced his or her thinking. According to Berra, a consensus was reached after the jurors went word for word through the transcript of plaintiff's testimony. He also testified that several of the definitions confused him rather than helped him and that he did not read other definitions to the jury since "they are almost exactly the same as what the judge put in as his definition of negligence." Berra stated that if he had not consulted Black's Law Dictionary, his verdict probably would have been the same, but he does not know how he would have voted if he had not gone through his individual analysis.

Based on this information, plaintiff filed a post-trial motion for a new trial. The trial court denied the motion, finding that plaintiff was not prejudiced by Berra's reading of the dictionary definitions to the other jurors. Plaintiff appeals.

■ We must determine whether the trial court abused its discretion in denying plaintiff's motion for a new trial on the basis that the jury's verdict was not tainted by the extraneous information considered during deliberations. (See *Waller v. Bagga* (1991), 219 Ill. App. 3d 542, 579 N.E.2d 1073.) While evidence that the jury considered extraneous information can be used to impeach the verdict, not every instance in which unauthorized information reaches the jury results in reversible error. (*People v. Holmes* (1978), 69 Ill. 2d 507, 372 N.E.2d 656.) The losing party need not prove actual prejudice from the juror's use of extraneous information, but only that the unauthorized information relates directly to an issue in the case and may have improperly influenced the verdict. (*Frede v. Downs* (1981), 101 Ill. App. 3d 812, 428 N.E.2d 1035.) The burden then shifts to the prevailing party to demonstrate that no injury or prejudice resulted. (*Heaver v. Ward* (1979), 68 Ill. App. 3d 236, 386 N.E.2d 134.) Because the actual effect of the extraneous information on the minds of the jury cannot be proved, the standard to be applied is whether the conduct involved such a probability that prejudice would result that it is to be deemed inherently lacking in due process. *Holmes*, 69 Ill. 2d at 514.

Plaintiff urges us to follow *Gertz v. Bass* (1965), 59 Ill. App. 2d 180, 208 N.E.2d 113, wherein an officer of the court gave the jury a Webster's Dictionary that was not admitted into evidence. The court determined that Webster's Dictionary defined the words "guest," "passenger," and "willful" and "wanton," which were crucial to a decision in the case, in a manner substantially different from and inconsistent with the way they were defined by the trial court in its instructions to the jury. The court found that this created prejudicial error and therefore reversed and remanded for a new trial. See *Haight v. Aldridge Electric Co.* (1991), 215 Ill. App. 3d 353, 575 N.E.2d 243 (case remanded for a new trial where extraneous information was introduced that presented conflicting evidence on a critical issue and a juror testified that this extraneous evidence had a significant impact on the jury's deliberations).

We find more persuasive the decision in *Danhof v. Richland Township* (1990), 202 Ill. App. 3d 27, 559 N.E.2d 1155, wherein the jurors consulted a two-volume Webster's Dictionary that was not admitted into evidence. At issue in *Danhof* was whether the plaintiff was prejudiced by the jurors' consulting the Webster's Dictionary for the definition of "proximate." The court found that the plaintiff suffered no prejudice since the dictionary definition of "proximate" did not "contradict, nullify, or negate the trial court's jury instruction on proximate cause." (*Danhof*, 202 Ill. App. 3d at 31.) Furthermore, at

an evidentiary hearing on plaintiff's post-trial motion, the jurors stated that they followed the court's instructions and the Webster definition of "proximate" did not affect their verdict. See *Birch v. Township of Drummer* (1985), 139 Ill. App. 3d 397, 487 N.E.2d 798 (the court held that a jury's unauthorized visit to the scene of an auto accident was harmless because the intersection at issue had not changed since the occurrence and the visit disclosed nothing about the location not accurately depicted by the photographs, maps, and diagrams that had been lawfully admitted into evidence); *People v. Palmer* (1984), 125 Ill. App. 3d 703, 466 N.E.2d 640 (extraneous information was not crucial or explicit enough to have prejudiced defendant and was cumulative).

■ In the instant case, the definitions obtained by Berra from Black's Law Dictionary and read to the jury during deliberations did not conflict with or substantially differ from the instructions given to the jury by the trial court. Berra read three definitions to the jury. Two of the definitions, which Berra took from Black's Law Dictionary, "reasonable" and "reasonable care," were essentially the same as those given by the court in its instructions to the jury. The reading of these definitions could not have caused plaintiff any prejudice since the definitions were merely cumulative of information properly given to the jury. Berra also read to the jurors the definition of "defective condition" that he had obtained from Black's Law Dictionary. The trial court never instructed the jury as to the meaning of "defective condition." However, we agree with the trial court that the introduction of this definition to the jury had no impact on the jury's verdict. Berra testified that after he read the definition of "defective condition" to the jurors, none of the jurors discussed the definition. Berra testified that by the time he read that definition, everybody was "pretty bored" and "started talking among themselves and [they] were basically waiting to get the transcript of [plaintiff's] testimony."

Plaintiff claims that the fact that the jurors were swayed by Berra's definitions is obvious because the jurors' votes were split until Berra read his notes to the jury. The sequence of events and Berra's testimony reveal instead that the jury's vote became unanimous based on their review of plaintiff's testimony. During deliberations, the jury asked for a transcript of the plaintiff's testimony. The trial court gave the jury the transcript at approximately 10:20 a.m., and the jury reached its verdict at about 11 a.m. Berra testified that the testimony of the plaintiff influenced jurors the most in reaching their verdict. When asked whether any of the jurors said during deliberations that the definitions Berra presented to them influenced his or her thinking, Berra responded:

"No. No. We—you know, as we came together, as we shifted from split down the middle to a unanimous thing, you know people changed their minds but the thing that really—the thing that I think really changed, brought the consensus, was when we actually went through word for word the testimony of [plaintiff]. We had requested from the judge a copy of the transcript of the actual questioning of [plaintiff].

We basically read through that word for word and passed that all around and that's pretty much what changed everybody's mind."

The trial court did not abuse its discretion in determining that it was plaintiff's testimony and not the dictionary definitions that persuaded the jurors to rule in defendants' favor.

Plaintiff also claims that he was prejudiced by the fact that Berra's notes contained a definition of "strict liability," while the case was presented to the jury only on a theory of negligence. Berra testified that he never read this instruction to the jury. Furthermore, his notes correctly defined "strict liability" as "liability without fault." Therefore, even if Berra had read this instruction to the jury, it would have prejudiced defendants, rather than plaintiff, since a strict liability standard requires plaintiff to meet a much lower threshold of proof than an ordinary negligence case.

In denying plaintiff's post-trial motion, the trial court noted that plaintiff was not prejudiced by the dictionary definitions read to the jurors and that the jurors reached their decision by carefully reviewing the evidence admitted at trial. The trial court noted that the jurors' decision was supported by the evidence in this case, which more strongly favored defendants. We cannot say that the trial court abused its discretion in reaching this decision.

Accordingly, for the reasons set forth above, the judgment in favor of defendant Cincinnati Incorporated is affirmed.

Affirmed.

COUSINS and HOURIHANE, JJ., concur.