FOURTH DIVISION

 FILED: 1/28/99

No.  1-97-4675

JANET MODELSKI, Special Administrator ) APPEAL FROM THE

of the Estate of JOSEPH MODELSKI, ) CIRCUIT COURT OF

Deceased, ) COOK COUNTY

)

Plaintiff-Appellant, )

)

v. )

)

NAVISTAR INTERNATIONAL TRANSPORTATION )

CORPORATION, ) HONORABLE

) LEONARD GRAZIAN,

Defendant-Appellee. ) JUDGE PRESIDING.

JUSTICE HOFFMAN delivered the opinion of the court:

The plaintiff, Janet Modelski, Special Administrator of the Estate of Joseph Modelski (Modelski), deceased, prosecuted the instant wrongful death action against the defendant, Navistar International Transportation Corporation (Navistar), charging that Navistar's negligence in the design, manufacture, sale, and distribution of its Farmall 450 tractor proximately resulted in Modelski's death.  The jury returned a verdict in favor of Navistar, the trial court entered judgment on the verdict, and the plaintiff now appeals.  For the reasons which follow, we reverse the judgment in favor of Navistar and remand this cause to the circuit court for a new trial.

The Farmall 450 tractor which is the subject of this liti­

gation was manufactured by Navistar, then known as International Harvester Corporation, on June 1, 1957.  Modelski purchased the tractor on April 22, 1989, from Brian Bigelow.  Bigelow had purchased the tractor at a farm auction in 1983.

As designed, the seat on the Farmall 450 tractor is mounted atop a metal battery box, which rests on the tractor's rear axle.  The cover of the battery box to which the seat is attached is hinged at the rear and secured at the front by two 1/2-inch bolts.  To access the battery, the two bolts at the front of the battery box cover must be removed and the cover with the seat attached must be tilted to the rear.

On May 7, 1991, Modelski was using the tractor to mow a field on his 40-acre farm located in Vandalia, Illinois.  At­tached to the rear of the tractor was a rotary mower known as a "Bush Hog."  Modelski died as a result of injuries he sustained when he was struck by the blade of the Bush Hog.  There were no witnesses to the accident.

Modelski's body was found lying face down on the ground with severe lacerations to his head and upper body.  The tractor was found in a ditch approximately 40 yards from Modelski's body.  When the tractor was found, the motor was not running, the ignition switch was in the "on" position, there were no bolts holding down the battery box cover, and the seat was tilted to the rear.  Only one rusty 7/16-inch bolt was found near the scene of the accident.  No 1/2-inch bolts were ever found.

In her second amended complaint, the plaintiff sought recovery against Navistar on a negligence theory.  The plaintiff charged, 
 inter
 
alia
, that the negligent design of the Farmall 450 tractor caused Modelski to be ejected to the rear when the bolts holding the front of the battery box cover disengaged, that Navistar negli­

gently failed to warn of the consequences of those bolts disen­

gaging while the tractor was in operation, and that Navistar was negligent in selling the subject tractor without a safety inter­lock on the seat.  Additionally, the plaintiff charged that Navistar was negligent in failing to provide post-sale warnings to foreseeable users of the Farmall 450 tractor after learning of the hazards associated with the design of the seat mounting and in failing to retrofit this model tractor to eliminate that hazard.  Several months prior to trial, Navistar moved the court to strike the charging allegations relating to its alleged negligence in failing to provide post-sale warnings or to retro­fit the subject tractor.  Navistar also moved for partial summary judgment on the negligence claim which was based on the sale of the tractor without a safety interlock on the seat.  Immediately prior to the commencement of trial, the court granted both of Navistar's motions and also denied the plaintiff leave to file a third amended complaint.

The case proceeded to trial before a jury.  The plaintiff presented evidence in support of her theory that Modelski was ejected to the rear of the tractor when the bolt or bolts holding the battery box cover disengaged, causing him to fall into the path of the Bush Hog.  Navistar, through the testimony of its reconstruction expert, Edward Caulfield, advocated the theory that Modelski was run over by the tractor and Bush Hog when he started the tractor while standing on the ground.  Prior to the commencement of trial, the court denied the plaintiff's motion 
in
 
 limine
 to bar Caulfield's opinion testimony as specu­lative.  The trial court also denied the plaintiff's motion to strike Caulfield's testimony on the same grounds made at the close of Navistar's case.

During the course of its deliberations, the jury requested permission to reenter the courtroom to examine the tractor seat assembly.  Although used demonstra­tively during the course of the trial, the seat assembly was never admitted into evidence.  Nevertheless, the trial court granted the jury's request.  Neither the judge nor the attorneys for the parties were present when the jury conducted its examination.

The jury returned a verdict in favor of Navistar.  The trial court entered judgment on the verdict and denied the plaintiff's post-trial motion.  The plaintiff now appeals, contending that: 1) the jury's verdict is against the manifest weight of the evi­dence; 2) the trial court erred in permitting the jury to perform experiments upon the tractor seat assembly which was never admitted into evidence; 3) the trial court erred in striking the allegations in plaintiff's second amended complaint charging Navistar with negligence for failing to provide post-sale warn­ings or to retro­fit the subject tractor; 4) the trial court erred in refusing to admit photographs into evidence depicting Modelski's injuries; 5) the trial court erred when it denied the plaintiff's motion to strike Caulfield's testimony; 6) the trial court erred in granting Navistar's motion to exclude certain evidence of prior similar occurrences; and 7) the trial court abused its discretion when it sustained Navistar's objection to plaintiff's proffered evidence that none of Navistar's competi­tors used a similar seat assembly design in 1957, refused to allow the plaintiff to demonstrate that the 7/16-inch bolt found near the accident scene would fit into a 1/2-inch nut, refused to permit the plaintiff's expert witness to testify concerning the feasibility of Caulfield's theory, and permitted Navistar to make use of photographic exhibits which had not been produced pursuant to the plaintiff's Supreme Court Rule 237 notice to produce (166 Ill. 2d R. 237).

We address first the propriety of the trial court permitting  the jury to have access to the tractor seat assembly during deliberations.  After closing arguments, the trial court stated that it would not allow the seat assembly to be sent to the jury room.  However, after the jury requested access to the seat assembly, the trial court acquiesced, and the unsupervised jury was permitted to reenter the courtroom, where the device was located.  Among the pleadings in support of her post-trial motion, the plaintiff submitted the affidavits of two jurors, Barbara Peterson and Erin Nye.  Peterson averred that the jury tested the seat both with and without bolts, and Nye averred that the jury tested the seat with one bolt threaded into the battery box.  Both jurors also swore that another juror, Richard Schaller, mounted the seat and bounced up and down.  According to Nye, Schaller bounced on the seat with one bolt threaded into the battery box.  According to Peterson, Schaller mounted the seat both with and without bolts present, and fell backwards when he tested the seat without bolts.

Navistar made only one substantive objection, either before the trial court or in its brief on appeal, to these juror affidavits.  It objected to the paragraphs in which the jurors stated that the results of the experiment were "very compelling."  Navistar is correct in its assertion that statements concerning the mental processes of a jury are inadmissible to impeach its verdict.  
People v. Szymanski
, 226 Ill. App. 3d 115, 120-21, 589 N.E.2d 148 (1992).  Consequently, we have ignored the offending paragraphs in the affidavits of Peterson and Nye.  However, since Navistar interposed no other substantive objection to these affidavits, we have considered the remaining factual averments contained therein.

A trial court has considerable discretion in determining which exhibits, if any, may be taken into the jury room during deliberations.  
Bautista v. Verson Allsteel Press Co.
, 152 Ill. App. 3d 524, 532, 504 N.E.2d 772 (1987).  The problem stemming from a jury's access to tangible exhibits was addressed in 
Main v. Ballymore Co.
, 116 Ill. App. 3d 1040, 1042, 449 N.E.2d 169 (1983), where the court observed that:

"[b]ecause of the fundamental rule that the jury may not receive evidence out of court, it has been held that insofar as tests or experiments carried out by the jury during deliberations have the effect of introducing new evidence out of the presence of the court and parties, such are improper; and, if the new evidence in question has a substantial effect on the verdict, prejudicial."

We agree with the plaintiff that the jury should not have been granted access to the seat assembly, both because it had never been introduced into evidence and because access invited the experimentation that took place.  Navistar contends, none­theless, that the plaintiff suffered no prejudice under the circumstances of this case.  It argues that the jury's experiment revealed nothing other than an uncontroverted fact; namely, that the tractor seat would tilt to the rear if a person mounted the seat when no bolts were present in the battery box cover.  What Navistar's argument fails to consider, however, is that the jury's experiment did not address the controverted question of whether bolts holding the battery box cover could vibrate loose while the tractor was being operated.  Just as in 
Main
, the jury's experiment in this case was not conducted under circum­stances similar to those present when the accident oc­curred, was not subject to evidentiary constraints or cross-ex­amination, and constituted the introduction of new evidence in the jury room.  
Main
, 116 Ill. App. 3d at 1043.  We believe, therefore, that the prejudice is manifest.

Next, we address the question of whether Caulfield's opinion testimony should have been stricken. To place the issue in perspective, we deem it helpful to briefly recount the theories of the parties as to how this accident occurred.

The evidence introduced at trial established that Modelski had nearly completed mowing his field when he was killed.  There is no question that, when the subject tractor was found, there were no bolts securing the front of the battery box cover and the seat was tilted to the rear.  No 1/2-inch bolts were found at the scene, but a 7/16-inch bolt was found by the coroner resting on the surface of the ground in the path of the tractor, approxi­mately 40 feet from Modelski's body.  The plaintiff introduced expert testimony in support of her theory that the bolt or bolts secur­ing the battery cover disen­gaged as Modelski was operating the tractor, causing the seat to tilt to the rear and eject Modelski into the path of the Bush Hog.  Navistar defended on the theory that Modelski was run over by the tractor and Bush Hog as he attempted to start the tractor while standing on the ground.

Caulfield, Navistar's reconstruction expert, testified that he believed the tractor stalled or experienced some other similar problem while Modelski was mowing the field and that Modelski dismounted to investigate the problem, failing to take the tractor out of gear or disengage the Bush Hog.  According to Caulfield, Modelski probably removed the bolts from the battery box cover in the course of investigating the mechanical diffi­culty.  He opined that Modelski restarted the tractor while standing on the ground; whereupon, the tractor moved forward when the engine engaged, knocking Modelski to the ground under the rear axle and causing the Bush Hog to be drawn over him.  On cross-exam­ination, Caulfield admitted that there was no physical evidence that the tractor stalled or that Modelski dismounted the tractor.  As stated earlier, the trial court denied both the plaintiff's motion 
in
 
limine
 to bar Caulfield's reconstruction theory and her later motion to strike that testimony.  Further, contrary to the asser­

tion in Navistar's brief, the plaintiff raised both rulings as grounds for relief in her post-trial motion.

The admission of expert testimony is a matter committed to the sound discretion of the trial judge.  
People v. Mack
, 128 Ill. 2d 231, 250, 538 N.E.2d 1107 (1989).  An individual will be permitted to testify as an expert if his experience and qualifi­cations afford him knowledge which is not common to lay persons and where his testimony will aid the jury in reaching its con­clusion.  
People v. Jordan
, 103 Ill. 2d 192, 208, 469 N.E.2d 569 (1984).

In this case, the plaintiff does not claim that Caulfield was not qualified to give expert reconstruction testimony.  Rather, she contends that his opinions as to how Modelski came to be struck by the Bush Hog are nothing more than guess and specula­tion.

In 
Wilson v. Clark
, 84 Ill. 2d 186, 192-96, 417 N.E.2d 1322 (1981), the Illinois Supreme Court adopted Federal Rules of Evidence 703 and 705 (Fed. R. Evid. 703, 705) and held that an expert witness may base his opinion on informa­tion that has not been admitted into evidence so long as that information is reliable and is of a type reasonably relied upon by experts in that field.  However, our adoption of Rule 703 does not guarantee the admissibility of all expert testimony if that testimony runs afoul of other evidentiary requirements.  
City of Chicago v. Anthony
, 136 Ill. 2d 169, 186, 554 N.E.2d 1381 (1990).

"An expert opinion is only as valid as the reasons for the opinion."  
Kleiss v. Cassida
, 297 Ill. App. 3d 165, 174, 696 N.E.2d 1271 (1998); see also 
Aguilera v. Mount Sinai Hospital Medical Center
, 293 Ill. App. 3d 967, 974, 691 N.E.2d 1 (1997).  "If the basis of an expert's opinion includes so many varying or uncertain factors that he is required to guess or surmise to reach an opinion, the expert's opinion is too speculative to be reliable."  
First Midwest Trust Co. v. Rogers
, 296 Ill. App. 3d 416, 427-28, 701 N.E.2d 1107 (1998).  "Mere surmise or conjecture is never regarded as proof of a fact."  
Lyons v. Chicago City Ry. Co.
, 258 Ill. 75, 81, 101 N.E. 211 (1913).

The concept of relevancy is basic to the law of evidence as it circumscribes admissibility.  
People ex rel. Noren v. Dempsey
, 10 Ill. 2d 288, 293, 139 N.E.2d 780 (1957).  In 
People v. Monroe
, 66 Ill. 2d 317, 321-22, 362 N.E.2d 295 (1977), the Illinois Supreme Court adopted Rule 401 of the Federal Rules of Evidence (Fed. R. Evid. 401).  Rule 401 provides that: " '[r]el­evant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determi­nation of the action more or less probable than it would be without the evidence."  Fed R. Evid. 401;  
Monroe
, 66 Ill. 2d at 322.  It follows, therefore, that testimony grounded in guess, surmise, or conjecture, not being regarded as proof of a fact, is irrelevant as it has no tendency to make the existence of a fact more or less probable.  From this conclusion follows the rule that expert opinions based upon the witness's guess, speculation, or conjecture as to what he believed might have happened are inadmissible. See 
Dyback v. Weber
, 114 Ill. 2d 232, 244-45, 500 N.E.2d 8 (1986).

In this case, Caulfield had no factual basis to support his opinion that Modelski's tractor stalled and he, thereafter, dismounted to make repairs, leaving the tractor in gear and the Bush Hog engaged.  Caulfield admitted on cross-examination that there was no physical evidence to support these notions.  We would hardly expect "expert" opinion testimony to be objective in the traditional sense of the term, but neither would we expect it to take the form of fictional musings as to what might have happened.  From Caulfield's admissions elicited through cross-examination, it is quite apparent that his opinions re­garding a mechanical breakdown necessitating Modelski to dismount the tractor were based on sheer speculation and should have been stricken as unreliable and totally irrelevant.

We do not suggest that all of Caulfield's opinion testimony should have been stricken.  Much of his testimony disputing the plaintiff's theory of the case was based on his expert analysis of the known physical facts.  We mean to be understood only as holding that his speculative opinions noted above should not have been admitted.  Further, we cannot conclude that the admission of those opinions was harmless error.  They interjected into the case the suggestion of a scenario of events which, if accurate, severed any proximate causal relationship between the design of the seat assembly and Modelski's death.

Navistar argues that, since the plaintiff introduced expert reconstruction evidence, it was entitled to do the same.  See 
 Zavala v. Powermatic, Inc.
, 167 Ill. 2d 542, 658 N.E.2d 371 (1995); 
Kelley v. American Motors Corp.
, 130 Ill. App. 3d 662, 474 N.E.2d 814 (1985).  We have no quarrel with that proposition.  However, even the admission of reconstruction testimony "turns on the usual concerns of whether expert opinion testimony is appro­priate generally."  
Zavala
, 167 Ill. 2d at 546.  To be admissi­ble, expert testimony must first be relevant, and speculation fails to satisfy that requirement.

Since we are unable to say that the jury's experiments with the seat assembly and the admission of Caulfield's speculative opinions did not affect the outcome below, the plaintiff is entitled to a new trial.  See 
J. L. Simmons Co., Inc., ex rel. Hartford Insurance Group v. Firestone Tire & Rubber Co.
, 108 Ill. 2d 106, 115-16, 483 N.E.2d 273 (1985).

Having considered what we believe to be the dispositive issues in this case, we need not address the majority of the plaintiff's remaining assignments of error.  We will, however, address those issues which are not dependent on an evidentiary foundation and which might arise again upon retrial.

The plaintiff argues that the trial court erred in striking the allegations in her second amended complaint charging Navistar with negligence for failing to provide post-sale warnings and for failing to retrofit the Farmall 450 tractor after learning of the hazards associated with the design of its seat assembly.  The propriety of the trial court's action in this regard turns on the issue of whether a manufacturer is under a duty to issue post-sale warnings or to retrofit a product after it has been sold.  In analyzing the question, we must remain mindful that the plaintiff sought recovery against Navistar on grounds of negligence, not strict liability.  Although claims against a manufacturer for negligence and strict liability are similar, they involve two separate theories of liability.  A strict liability claim focuses upon an unreasonably dangerous condition of a product, which condition existed at the time the product left the control of the defendant.  As a result, the care exercised by the defendant is not a relevant consideration in such an action.  
Suvada v. White Motor Co.
, 32 Ill. 2d 612, 621, 210 N.E.2d 182 (1965).  In contrast, the very essence of a negligence action is the defendant's duty to exercise due care under the attendant circumstances.

In this case, Navistar argues that it was under no legally recognized duty to warn foreseeable users of any dangers associated with the use of its Farmall Model 450 tractor of which it was not aware, nor should it have been, when the tractor left its control.  The plaintiff contends that the manufacturer of a product is under a continuing duty to warn of hazards associated with the use of its products, even those hazards discovered post-sale. 

"The determination of whether a duty to warn exists is a question of law."  
Genaust v. Illinois Power Co.
, 62 Ill. 2d 456, 466, 343 N.E.2d 465 (1976).  A manufacturer, reasonably aware of a dangerous propensity of its product, has a duty to warn foreseeable users where there is unequal knowledge, actual or constructive, and it knows or should know that harm might or could occur if no warning is given.  Failure to warn under such circumstances can expose the manufacturer to liability for negligence.  See 
Carrizales v. Rheem Manufacturing Co., Inc.
, 226 Ill. App. 3d 20, 31-34, 589 N.E.2d 569 (1991).  Manufacturers are charged with the knowledge of experts.  
Anderson v. Hyster Co.
, 74 Ill. 2d 364, 368, 385 N.E.2d 690 (1979).  Given that presumed degree of knowledge, a manufacturer's subjective understanding of the dangers associated with the use of its products, while relevant, is not determinative of its obligation to warn.  Rather, it is sufficient to impose a duty to warn if an expert in the field would have known of the product's dangerous propensity and foreseen injury in the absence of a warning.  Under such circumstances, the duty to warn may well be continuous.  See 
Proctor v. Davis
, 291 Ill. App. 3d 265, 278, 682 N.E.2d 1203 (1997).  The question remains, however, whether such a duty includes an obligation to issue post-sale warnings of dangers which were not known, nor should they have been known, at the time the product left the manufacturer's control.

In 
Woodill v. Parke Davis & Co.
, 79 Ill. 2d 26, 33-36, 402 N.E.2d 194 (1980), the Illinois Supreme Court held that the plaintiff in a strict liability action predicated on a failure to warn theory against a product manufacturer was obligated to plead and prove that the manufacturer knew or should have known of the injury causing propensity of its product at the time the product left its control.  We can perceive of no reason to lessen that burden in a negligence action.  As noted in 
Collins v. Hyster Co.
, 174 Ill. App. 3d 972, 977, 529 N.E.2d 303 (1988), "the law does not contemplate placing the onerous duty on manufacturers to subsequently warn all foreseeable users of products based on increased design or manufacture expertise that was not present at the time the product left its control."  If such a duty were imposed, it might well "discourage manufacturers from developing safer products."  
Carrizales
, 226 Ill. App. 3d at 35; but see Restatement (Third) of Torts: Products Liability §10 (1997).

In this case, the plaintiff charged Navistar with negligence in failing to provide adequate warnings of the consequences which would result if the bolts securing the front of the battery box cover disengaged during the operation of the tractor.  That charge was not stricken by the trial court, and the jury was instructed on a derivative of the issue.  The charging allegation relating to post-sale warnings, however, was stricken.  Assuming that allegation was not intended to be totally duplicative of the allegation which was not stricken, it could only have referred to warning of a danger which did not come to Navistar's knowledge until after the tractor left its control.  If our assumption is correct, Navistar had no duty to warn of such danger.  If our assumption is incorrect, then the charge was duplicative.  In either case, it was properly stricken.

The other allegation stricken from the plaintiff's second amended complaint charged Navistar with negligence for failing to retrofit the tractor, after its sale, with a safety device which would have eliminated the hazard created by the unexpected loss of the bolts securing the front of the battery box cover.  To the extent that this allegation could be read to charge Navistar with failing to incorporate safety precautions to eliminate a hazard known to exist at the time the tractor left its control, it was properly stricken as duplicative of another allegation charging negligence in design.  If the plaintiff meant to charge Navistar with negligence for failing to retrofit the tractor to remedy a hazard of which it did not know, nor should it have known, until after the tractor was sold, then the allegation failed for want of duty and was properly stricken.

To be sure, there are a number of safety statutes, such as the National Traffic and Motor Vehicle Safety Act (see 49 U.S.C. §30101, §30118 (1998)) and the Consumer Product Safety Act (see 15 U.S.C. §2051, §2064(a) (1996)), which make product recalls and retrofitting mandatory even under circumstances where the dangerous characteristic to be remedied is not discovered until after the product has left the manufacturer's control.  However, in the absence of such a statutory obligation or a voluntary undertaking to retrofit, we know of no reported case in Illinois imposing such a duty on a manufacturer.

The theory of design negligence falls within the framework of general negligence law.  
Murphy v. Cory Pump & Supply Co.
, 47 Ill. App. 2d 382, 393-94, 197 N.E.2d 849 (1964).  One of the factors a court should consider in determining whether a defendant is under an obligation to conform to a certain standard of conduct for the protection of another is the consequences of placing that burden upon the defendant.  
Lance v. Senior
, 36 Ill. 2d 516, 518, 224 N.E.2d 231 (1967).  The consequences of imposing upon manufacturers an extrastatutory duty to recall and retrofit used products to incorporate post-sale state of the art designs would be the equivalent of mandating that manufacturers insure that their products will always comply with current safety standards.  This we are unwilling to do.  If such a continuing duty is to be imposed, it is the legislature that is better suited to the task.  In a legislative setting, due consideration can be given to the type of products to which such a duty would apply and to whether a statute of repose should be enacted to limit the potentially infinite duration of the duty.

Our conclusion in this regard is supported by the recent pronouncements of the American Law Institute.  Section 11 of the Restatement (Third) of Torts: Products Liability (1997) provides that:

"One engaged in the business of selling or otherwise distributing products is subject to liability for harm to persons or property caused by the seller's failure to recall a product after the time of sale or distribution if:

(a)(1) a governmental directive issued pursuant to a statute or administrative regulation specifically requires the seller or distributor to recall the product; or

  (2)  the seller or distributer in the absence of a recall requirement under Subsection (1), undertakes to recall the product; and

(b) the seller or distributor fails to act as a reasonable person in recalling the product."

The rationale for such a rule is articulated in comment (a) to section 11, which states:

"Duties to recall products impose significant burdens on manufacturers.  Many product lines are periodically redesigned so that they become safer over time.  If every improvement in product safety were to trigger a common-law duty to recall, manufacturers would face incalculable costs every time they sought to make their product lines better and safer."  Restatement (Third) of Torts: Product Liability §11, Comment a (1997).

Our holdings that a manufacturer is under no duty to issue post-sale warnings or to retrofit its products to remedy defects first discovered after a product has left its control are by no means lacking in extrajurisdictional authority to the contrary.  See 
Syrie v. Knoll International
, 748 F. 2d 304 (5th Cir. 1984); 
 Braniff Airways, Inc. v. Curtiss-Wright Corp.
, 411 F. 2d 451 (2d Cir. 1969).  In 
Braniff
, the United States Court of Appeals for the Second Circuit, apparently applying Florida law, held that if a design defect comes to the attention of the manufacturer after a product has been sold, the manufacturer has a duty to either remedy the defect or, if a complete remedy is not feasible, to give users adequate warnings and instructions concerning methods for minimizing the danger.  
Braniff
, 411 F. 2d at 453.  The United States Court of Appeals for the Fifth Circuit, applying Texas law, held in 
Syrie
 that such post-sale duties arise only when a manufacture assumes them by regaining some measure of control over the product.  
Syrie
, 748 F. 2d at 311.  Such decisions to the contrary, we nonetheless believe that our resolution of the questions is in keeping with established Illinois precedent.  See 
Woodill
, 79 Ill. 2d 26; 
Carrizales
, 226 Ill. App. 3d 20; 
Collins
, 174 Ill. App. 3d 972.

For these reasons, we: 1) affirm the order of the trial court striking the allegations in the plaintiff's second amended complaint charging Navistar with negligence in failing to provide post-sale warnings and to retrofit the Farmall 450 tractor, 2) reverse the judgment entered in favor of Navistar, and 3) remand this case to the circuit court for a new trial.

Affirmed in part; reversed in part and remanded.

SOUTH, P.J., concurs and WOLFSON, J., specially concurs.

JUSTICE WOLFSON, specially concurring:

I agree with the result reached by the majority, and, for the most part, I agree with how it got there, but I write to add two observations.

First, the majority's analysis of the "experiment" by the jury is not complete.  The defendant vigorously contended in its brief and in oral argument that the plaintiff asked that the tractor seat assembly go back to the jury.  The plaintiff contended she merely asked the trial judge whether he was going to send it back and the judge answered in the negative.

While the record on the subject is far from complete, it is fairly apparent from the post-trial colloquy that the trial judge agreed the plaintiff did not ask that the seat assembly be sent back.  We should make that finding, because if the plaintiff did ask that the seat assembly be sent to the jury she has no right to complain about it on appeal.  In addition, I think it is important to note the trial judge changed his mind about  allowing the jury to have it but did not notify the parties of that decision.  Had notice been given, the issue might have been obviated.  At least, we would have a better record on the point.

My second observation is something of a quibble, but one that I think matters.  I agree that Caulfield's reconstruction opinion should have been stricken, but I would not rely solely on a finding of lack of relevance.  Of course, to be admissible, evidence must be relevant.  But that is not the complete analysis where expert opinion evidence is offered.  The United States Supreme Court has directed Federal trial judges they "must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."  
Daubert v. Merrell Dow Pharmaceutical, Inc.
, 509 U.S. 579, 589, 125 L. Ed. 2d 469, 480, 113 S. Ct. 2786, 2795 (1993).

Opinions that are based on guess and speculation, as Caulfield's were, are unreliable and therefore inadmissible.  A persuasive argument can be made that Caulfield's reconstruction testimony was relevant to the issues in the case.  The argument collapses when tested in terms of reliability.  See 
First Midwest Trust Co. v. Rogers,
 296 Ill. App. 3d 416, 428, 701 N.E.2d 1107 (1998).

21